SEITTN v. ALASKA TREADWELL GOLD M. CO.

(First Division. Juneau. February 6, 1903.)

No. 178A.

1. MASTER AND SERVANT—NEGLIGENCE—RULES REQUIRING SERVANT TO EXAMINE PLACE OF WORKING.

Where the operator of quartz mines gave notice to the employés of the adoption of additional and printed rules requiring the servant to inspect the particular place where he worked in advance, and ascertain that he was secure therein, *held* that, while such rules imposed a duty upon the servant, they did not relieve the master from his duty of furnishing a reasonably safe place for the servant to work.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 235-240, 714.]

2. SAME—RULES FOR GUIDANCE OF SERVANT.

Whether rules adopted by the master imposing the duty upon the servant to examine the conditions surrounding his work and

to maintain himself in security binds the servant and frees the master from responsibility will depend upon the character of the service and the opportunity of the servant to examine; such rules will not invariably excuse the master from responsibility.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 235–240, 714.]

3. SAME.

A rule that requires the employé to make a personal inspection as to the safety of the place where he is performing or is to perform his work, in order to relieve the master of any duty in that behalf, must be reasonable per se; must refer to conditions surrounding the service in which the servant is employed; must refer to the place where the servant is employed as affecting the safety thereof; and must be understood as referring to the dangers that are obvious, and are or would become readily discoverable upon inspection of the place and its surrounding conditions by a person of ordinary understanding and competence for the service in which employed.

4. SAME—CONTRIBUTORY NEGLIGENCE—PLACE FOR WORK.

Where the danger is patent, and is known alike to the master and servant, and the servant chooses to go into the place of danger without taking any precautions for his safety, the servant under such circumstances, and particularly where the rules of the corporation require him to exercise care in the method of doing his work, is guilty of contributory negligence; and where the proof is clear of such lack of care on the part of the servant, he cannot recover damages.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 733, 757.]

5. MASTER AND SERVANT—NEGLIGENCE—DUE CARE.

The master never warrants the servant's safety and never guaranties the safety of the place. He discharges his duty by observing due care in his behalf. The servant may not by indifference and want of care bring misfortune upon himself, and then charge the master with negligence when disaster comes to him, but he must be alert and observant of conditions around him; and particularly is this true where the rules of the master, in addition to the duties the law imposes, requires him to make inspection for his own protection.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 171–175, 209.]

6. Negligence—Trial—Question for Jury—Contributory Neg-
LIGENCE.

It is generally held that contributory negligence is a question
for the jury, and is one that should never be taken from a jury
unless the case is so clear that in case of a verdict against the
defendant it could not be sustained by the court.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Negli-
gence, §§ 279–286.]

On Motion to Instruct the Jury for Defendant.

The plaintiff in this case alleges, in brief, as follows:
That on the 25th day of March, 1902, he was the servant
of the defendant corporation, and as such employed in op-
erating what is called a "machine drill," which machine
drill was situated in what is called the "Glory Hole" in the
Alaska Treadwell Company's mine, the said Glory Hole be-
ing a pit or quarry excavated to a considerable depth, and
an unusually unsafe and dangerous place to work, and be-
ing rendered more so by reason of a slide a short time
previous to the plaintiff's injury, which was well known or
ought to have been known by the defendant, and was un-
known to the plaintiff; that on said day, in operating said
machine drill in said Glory Hole, by reason of the unlawful
carelessness and negligent conduct of the defendant, the
plaintiff was severely and permanently injured and disfigured,
as in said complaint set forth; that the defendant, knowing
said Glory Hole to be a dangerous and unsafe place to
work, and that the same was in a dangerous condition
by reason of said slide, which left the walls immediately
above and over the place where the plaintiff was working
in a loose, broken, and shaken up condition and liable to give
way, which the defendant had carelessly permitted to so
remain, and of which the plaintiff had no knowledge, and
did direct and cause said plaintiff to go in said Glory Hole
and set up and operate said machine drill, and while oper-

ating said drill in said Glory Hole, pursuant to the directions and instructions of the defendant, there broke off and fell from the bank or side of said Glory Hole a large quantity of rock or boulders directly above the plaintiff, which said rock and boulders struck plaintiff, hurling or knocking him to the bottom of said Glory Hole, a distance of about 90 feet, crushing and breaking plaintiff's left foot and leg, and breaking and crushing plaintiff's jaw, and disfiguring his face and otherwise injuring him; that the injury of the plaintiff was received without any negligence or fault of the plaintiff, and solely through the negligence and want of care of the defendant.

The answer admits that plaintiff was engaged in operating a machine drill in the pit in defendant's mine; denies that the place where the plaintiff was working was a dangerous, unsafe, or unusal place to work, or that there were any such dangers connected therewith except such as were inherent in the character of the work, and well known to all the employés of the defendant working in said mine, including the plaintiff; denies that the place where plaintiff was at work was rendered more dangerous by reason of any slide a short time previous to the accident to the plaintiff, and denies there was any such slide at all, as alleged by plaintiff; denies that the walls of said pit immediately over and above where plaintiff was at work were broken, loose, and shaken, and liable to give way; denies all the allegations of negligence on the part of the defendant alleged by the plaintiff; denies that there broke off and fell from the bank or side of said Glory Hole or pit a large quantity of rock, earth, and boulders from directly above plaintiff, which struck plaintiff and hurled him to the bottom of said pit; denies that plaintiff was injured to the extent alleged; that in truth and in fact plaintiff was struck by a single small piece of rock, which was by plaintiff's own negligence al-

lowed to fall upon him, and he was slightly injured thereby; denies plaintiff was permanently or seriously injured or his ability to earn a living permanently impaired; denies that plaintiff could ordinarily earn the sum of $3.50 per day, as alleged, or any sum greater than $2.50 per day, but admits that by working in said pit and assuming the risks inherent in said work plaintiff could earn $3.50 per day; denies that the injury complained of was received without fault or negligence on the part of the plaintiff, and alleges that whatever injury plaintiff received was due solely to his own want of ordinary and proper care in guarding against well-known and obvious dangers and disobeying the rules and instructions formulated by defendant to protect its employés against accident such as that by which the plaintiff was injured; and further denies that the accident complained of was caused in any manner by the negligence of the defendant; denies that plaintiff has been damaged in the sum of $20,000 or at all.

The evidence in this case having been concluded on the part of the plaintiff, the defendant moved the court to instruct the jury to return a verdict for defendant on the ground, among other things, that the evidence on the part of the plaintiff was wholly insufficient to sustain a finding of negligence on the part of the defendant, and on the further ground that the plaintiff's own evidence shows it was the duty of the plaintiff, in common with all employés of the defendant operating a machine drill, to look out for and attend to the safety of the ground where they were at work, and therefore, if plaintiff was injured in the manner claimed by him, it was due to his own neglect and failure to perform his duty. It was further urged that plaintiff was familiar with all such dangers as that by which he was injured and which were inherent in the nature of the work he was engaged in; that he voluntarily sought such work

for the purpose of securing the increased wages, and remained in said employment well knowing the dangers inherent therein, and thereby assumed the risk of all such dangers.

. It is urged in argument that the rules of the company, which had been interpreted to the plaintiff and properly posted about the mine, required each person operating a machine drill to make examination of the ground, and themselves determine the danger or safety of the place where they were to work. At the time the rules were not in evidence, and the court was without any knowledge of the same, except a very imperfect statement of what the plaintiff conceived them to be. It was claimed in argument that, inasmuch as the plaintiff was required to examine such conditions as existed as to whether the place in which he worked was a safe place, if he had failed in the performance of that duty, and had received injury thereby, it resulted clearly from his own negligence and carelessness. The court was of the opinion that the question as to the plaintiff having been made responsible for the conditions under which he worked, and having been required to determine for himself as to the safety of the place and the conditions around him under the rules of the company, was not then fairly raised or presented to the court for its consideration. The court therefore denied the defendant's motion. The defendant then put in his testimony, and, after all the testimony was in on both sides, filed a new motion, based practically upon the same grounds as the motion filed at the conclusion of plaintiff's main case. The motion has now been argued at great length by both sides and many authorities cited.

W. E. Crews, for plaintiff.

Maloney & Cobb, for defendant.

BROWN, District Judge. In approaching a discussion of the questions involved in the motion I may say the law affecting the right of the servant to recover for personal injuries·sustained while in the employ of the master seems to have traveled in no uncertain pathway from the days of the old English Case of "Van" down to our own time. The general principles applicable to this class of cases have been long settled, and at this day there is practically no diversity of opinion among courts and law-writers in respect to them. But in the application of well-settled principles to the varying facts of different cases there is found a wide divergence. In the effort of courts to apply a principle to variant facts in order to mete out justice in each particular case as made by the evidence, the principle is sometimes whittled away until there remains only a diminutive point.

Nevertheless, in surveying the whole field of the law upon this subject, one is often filled with a sentiment of wonder and admiration for the courts of last resort of our own and other countries, who have succeeded, by their great learning, wisdom, and broad good sense and judgment, in meeting the demands of justice through the ever changing conditions of human society growing out of new inventions in machinery and appliances and the new methods of work and employment.

This question is now fairly before the court for its determination: Do the rules of the defendant company requiring the men operating machine drills to examine conditions around them, and determine for themselves the question of danger or safety of the place where they work, add additional burdens to the duty of the employé beyond those ordinarily required in the performance of like duties? Is the defendant by the adoption and posting of such rules relieved of any duty otherwise required of it toward its servant, and may the master relieve himself of the duty to-

wards his servant to furnish an ordinarily safe place `in which to work, considering the circumstances and nature of the employment, by formulating and publishing rules? There is also the further question presented under the evi · dence as it now stands as to whether the dangers to which the plaintiff was exposed and through which his injury came were or came within the .terms' of his contract of hire? it being understood, of course, as a proposition of law, that the servant assumes all those risks necessarily incident to the employment upon which he enters; and further, was the injury, if any, the result of contributory negligence?

The rules of the company are in part as follows:    (1) Each man must ascertain that the particular place in which he is employed is absolutely safe.  If found to be in an unsafe condition, measures must be taken to remove such danger at once, and, if necessary, the foreman or shift boss must be notified.  (2) When returning ·to a place after a blast has been fired, the first employé to enter such place ·must make a careful examination for any loose rock or other element of danger, and if any such be found he shall immediately make it safe.

These rules are proper, and valuable in calling the attention of the workmen to their duties, and clearly notify them of the' necessity for an examination of the conditions around them, to determine whether the place in which they are at work is safe or otherwise.  It implies, at least, that reasonable time shall be used by the employé to examine, from time to time, the changing conditions around him, and to see to it that he is exposing himself to no needless risk or danger.  It is believed that these rules impose some additional burden upon the employé, but they do not in any wise, in the opinion of the court, relieve the defendant company from its obligation to furnish its servant a reasonably safe place in which to work.  The obligation

upon the master remains notwithstanding the rules he has adopted for the safety of his servants, though the servant is placed by these rules somewhat upon his duty, by making a more extended examination, and using greater care than he might be required to use had not such rules been adopted. But to say that the servant, by the adoption of such rules on the part of the master, is thereby made the absolute guardian of his own safety, and that the master has no further duty than this toward the servant because he has required the servant himself to examine conditions around him is, in my opinion, to state as a proposition of law one that cannot be maintained either by authority or upon principle.

There are conditions under which the rights of a servant to recover could in no wise be affected by such rules. It would be absurd to require an engineer or conductor of a train to examine the conditions of the track for miles in advance, to determine whether it would be safe to run his train over it, before venturing thereon with his engine or train. But it would be reasonable and just to say to the conductor, "the river is high at such a point on your road, and the banks are washing out at the crossing; you must not venture upon the bridge until you have consulted the watchman and made personal examination." It would seem that every one would agree that such an order or rule would not only be reasonable and proper, but its violation, if injury came to the conductor by running his train upon the bridge without examination or inquiry of the watchman, would preclude him from recovering damages therefor. Many other illustrations might be used to demonstrate the value or lack of value of rules of the character here offered in evidence, but, without further discussion of that matter, there seems but one conclusion clearly deducible, viz., a rule that requires the employé to make personal in-

spection as to the safety of the place where he is perform-
ing or is to perform his work, in order to relieve the mas-
ter of any duty in that behalf, must be reasonable per se;
must refer to conditions surrounding the service in which the
servant is employed; must refer to the place where the
servant is employed as affecting the safety thereof; and
must be understood as referring to the dangers that are
obvious, and are or would become readily discoverable upon
inspection of the place and its surrounding conditions by
a person of ordinary understanding and competence for
the service in which employed.

Counsel for the defendant cites with great confidence
English v. C., M. & St. P. Ry. Co. (C. C.) 24 Fed. 906,
the decision being by Mr. Justice Brewer. This litigation
arose out of a death occurring during the repair of a water
tank on said railroad. There was a shelf around the base
of the tank some feet from the ground, about 21 inches
in width, and at the widest place perhaps 2 feet and 5 or 6
inches in width, with no railing around the bottom of the
tank to hold on by. The men that were repairing the
tank had to stand on this shelf. One of them, while work-
ing, slipped and fell to the ground and was killed. Judge
Brewer says:

"The company was negligent as to said shelf, and there is no
question but it was grossly negligent. It would have been a very
simple thing to have put an iron rail on the outside of that tank,
which a man might hold on to, and the company ought to have put it
on. But the question, and the only substantial question, in the case,
as counsel well say, is whether deceased was guilty of contributory
negligence. I take it the law as stated by counsel for plaintiff is sup-
ported by many authorities, and is correct, that where a master com-
mands his servant to go outside of his regular employment to do a
work which is attended with special danger, and the servant in re-
sponse to the specific commands of his master goes and does the
work in the way and at the time directed, the fact that the servant
knew it was dangerous does not exonerate the master from responsi-
bility, or make the servant guilty of contributory negligence, unless

2 A.R.—2

the character of the danger be so patent and so extreme that no one but a foolhardy, reckless man would attempt it. * * * It does not appear from the testimony whether a ladder could or could not have been obtained, but he might have taken time to do something. He might have driven in some nails for his protection, or used other methods which would have afforded him protection. The testimony is silent upon this point, but it appears that there was no specific directions, nor was English commanded to do this work in a specific way and in a specified time. It is very clear from the testimony that he might have taken a great many precautions to protect himself without infringing upon the commands which were given to him. But instead of that he walked around, stood on a slippery place, and fell. Under these circumstances, can it be said that he was not guilty of contributory negligence? * * * This is one of the dangers whose existence and extent every one has equal capacity for determination. A slippery wall with ice on it, with no support—you do not require to have any technical knowledge, or to be skilled in machinery, or learned in the law, to know that there was danger in walking thereon. When I walk on a shelving place I know it is dangerous, and if there is ice on it, it is more dangerous; and if there is nothing to hold on to, that makes it still more dangerous. Every one knows that. It is not as though the master had sent the servant among some machinery of whose danger only a mechanic may have full knowledge."

It will be observed that this man was sent away from his regular employment to an unusual employment, to do a particular thing. He was at liberty to protect himself, and to do the work in his own way, having no orders about it. He deliberately chose to go upon a place of danger that was so clear and certain that no man could mistake it. The man himself must have seen and recognized the danger, knew it as well as any one could possibly tell him; he chose to take the chance, and was killed. Can there be any doubt that this was contributory negligence, no matter what the negligence of the corporation? But does this case in any wise tend to support the contention of counsel? It is clear, we think, as a principle of law, that where the danger is patent, and is known alike to the master and servant, and the servant chooses to go into the place of

danger without taking any precautions for his safety, the servant under such circumstances, and particularly where the rules of the corporation require him to exercise care in the method of doing his work, is guilty of contributory negligence, and where the proof is clear of such lack of care on the part of the servant he cannot recover damages.

The next case cited by counsel for defendant is found in 31 Fed. 528 (Anderson v. Wintson). This is a case where the plaintiff was one of a gang of workmen hired by the contractors, and while excavating a tunnel was injured by an earth slide produced by a cracking of the soil from the blast. The dirt slid in upon the plaintiff, and he was injured. During the blasting a crack was formed. After a blast on the afternoon of the day before the accident, and some time during the morning, there was a slide of earth which injured the plaintiff. It is claimed the foreman of the gang saw the crack, and did not inform the men of the fact that it was a dangerous place. The plaintiff was ordered to work there. The evidence of all the parties, with the exception of one, in regard to the character of the excavation, goes directly to the point that the foreman saw the crack, and that they also saw it. Anderson testified he didn't see it, but it was obvious, if there was any danger, it was as apparent to Anderson as to any one else. In this case it would seem that, because the danger was patent, and was either observed or might have been observed by all persons exposed to the danger, the plaintiff was guilty of contributory negligence. The evidence in the case at bar is not at all uniform upon the question of the patentcy of the danger which threatened Seittn; indeed, it is testified by the foreman, Noonan, that when he looked at the place in the morning of the day of the accident it looked safe, and the plaintiff testifies that it was safe as far as he could see and examine.

Counsel for defendant also cites Bennett v. Tintic Iron Co. (Utah) 34 Pac. 61. In that case the plaintiff was employed in loading and carrying away ore on a roadway constructed across the face of a body of ore, with a precipice 75 feet below it, and a bank running across 30 feet above it. A shot having been fired to dislodge ore above the roadway by a workman experienced in such employment, by direction of the defendant the foreman examined the bank above the roadway by letting himself down from the top on a rope, and felt for loose ore with a pick. This examination having been made, plaintiff was told by the foreman the roadway was safe, and went again to work. Shortly afterwards the bank above the roadway fell down, and knocked the plaintiff down the precipice below. It was held there was no evidence of negligence on the defendant's part. It will be observed that after the shot was fired, and before the plaintiff went to work on said roadway, the defendant caused the place of danger to be carefully examined, and after such examination it was deemed safe. Under these circumstances, it would seem that the defendant had used reasonable care in providing a safe place to work.

In the case of Erskine v. Chino Val. Beet-Sugar Co. (C. C.) 71 Fed. 270, it would seem that Erskine was injured by the breaking of a certain rope; that he had charge of all the ropes and rigging of the company, and had selected the same rope used at the time of his injury. The court held that, inasmuch as the duty of inspecting the rope and the selection of it in the first instance devolved upon Erskine, he could not recover for injuries sustained by a defect in the rope; it being clear at the same time that the defect in the rope was not a patent one, and was one that the master could not have been informed of. Counsel in the case at bar seems to believe that, because it was the duty of the servant in that instance to inspect the rope and rigging

with which he was working, it places the case on all fours with the one at bar, since the rules of the company in this case required Seittn to make an inspection of his surroundings before he went to work. The conditions are wholly and entirely different. In the Erskine Case the defect was not one that the master could have remedied by reasonable effort and precaution, and such defect, if there was one, must have been better known to Erskine than to the master, because the duty devolved on him to make the examination, and determine the fact of the sufficiency of all the rigging. This was a hidden defect, for which the master could in no wise be held responsible, and if there was fault at all it was the fault of the servant, and he could not recover. We might say if the defect in the wall or the condition of the wall in this case was one that might not have been reasonably known and ascertained by the master, and the duty had devolved upon the plaintiff, Seittn, to make a special examination, and had the plaintiff here made such special examination, and failed to discover any defect or extraordinary danger, the master would not be liable. But the question in this case is not that it was clear the defect was a hidden one. On the one side it is claimed the defect in the wall was evident, and was made the more evident to the master because of an accident that had occurred a few hours before, which brought the matter particularly to its notice.

The case of Lindsay v. New York, N. H. & H. R. Co., 112 Fed. 384, 50 C. C. A. 298, is a case where a brakeman was injured by falling into a drain. The syllabus of the case is sufficient to indicate the question involved, and is substantially as follows: Where a brakeman who had been continually employed in a railroad yard for over nine months was injured by falling into a drain which with 118 other similar drains had plainly existed in the yard during all the time of his employment in substantially the same condi-

tion, he should be presumed to know the existence of such drains and to have assumed the risks thereof. Where a risk of a certain employment is plainly observable to an employé, and he continues to work where such risk is constantly encountered, he assumes the risk as a matter of law, and the question is not for the jury. This is a principle of law that is commonly enforced in all cases of damage. How far it should be considered as controlling in the case at bar depends upon the circumstances of the two cases. In the case under consideration by the court of appeals last above cited the conditions were so obvious and had been so long known to the employé that the court must necessarily have held that whatever the risk attending the employment by reason of the drains was assumed by the servant. But this case when compared with the case at bar is not very persuasive, because the facts and circumstances are so entirely different. The case before the New York court showed that the drains had existed for months; that there were 118 drains of a similar character to the one wherein the servant was injured; that the yards during all the time of the servant's employment had been substantially in the same condition. There was no change in the drains nor in the conditions under which the servant worked. Could it be possible that a servant, knowing and understanding all these conditions, could say that the master was liable for any injury that he had sustained when he chose to continue his work with full knowledge of the danger if there was danger? We think not, and that the court in that case was sustained by the great weight of authority.

The case of the Moon-Anchor Consol. Gold Mines, Limited, v. Hopkins, 111 Fed. 298, 49 C. C. A. 347, it would seem, was one wherein the verdict was based upon some offered testimony which was excluded by the court, and was therefore not before the jury for its consideration. And, not-

withstanding the action of the court in excluding such testimony, and no exception having been taken to such ruling of the court, counsel evidently argued such matters to the jury, and the appellate court holds that their action was improper, and that their verdict could not be sustained for this reason. An accident had occurred in the mine, and an effort was being made to repair conditions that existed which rendered the place unsafe for workmen. The court held, and very properly so, 'it seems to me, that when the servant was engaged in performing a service in making safe a place which had become dangerous during the progress of the work, that the relation between the master and servant was changed, and the servant assumes the risk incident to the dangerous condition of the place as one of the hazards of the employment, if the servant knows of it, or should know of it by the exercise of ordinary care and observation. Surely by going into a place, attempting to do work to make a place safe where an accident has occurred which makes the place unsafe, the servant would assume the risk of the peculiar employment.

Again, counsel for the defendant cites Bethlehem Iron Works v. Weiss, 100 Fed. 45, 40 C. C. A. 270. In that case it was held:

"The rule that it is the duty of a master to provide his servant with a reasonably safe place in which to work is not an absolute one, but is qualified and limited by the other rule that the servant assumes all the ordinary risks incident to the service so far as those risks at the time of entering upon the service are known to him, or should be readily discernible to a person of his age and capacity, in the exercise of ordinary care, whether his business is dangerous or not. Such rules do not deprive the master of the right to manage and conduct his business according to his own judgment, even though other methods might be safer; and where the place provided by him for the servant to work is free from dangers which are latent or not obvious, or he has instructed the servant upon entering his service expressly of such dangers, if they exist, he has fulfilled his duty in the premises."

This was a case where a person in the master's employ was running a wheelbarrow at night to carry out old loam and bricks and bring in new loam and bricks. While employed in this service he was struck by the cars or engine of the master while crossing the railroad track. It is not necessary to repeat in detail the facts in the case. Briefly, it is said that the servant had been engaged but three nights at the time of the injury; that he perhaps understood the rules of the company; that these had been explained to him; but it had not been made clear to him the particular dangers which surrounded the work which he was performing, or that he might come in contact with the cars in their movements back and forth to and from the mill. The court in that case held that the question of contributory negligence by the company was properly submitted to the jury. Under the facts presented in that case, the question as to whether contributory negligence was properly submitted to the jury was a close one, and the case was examined with great care by the court.

The question presented in the case at bar is somewhat unusual, and in my opinion one that may be regarded under all the facts and circumstances of the case, as to whether the question of contributory negligence should be submitted to the jury, a close one. The rules of the company, of which the plaintiff was advised, were to the effect that each man should ascertain that the particular place in which he was to work was absolutely safe. If found to be unsafe, the employé was to notify the foreman or shift boss. It was also required that, when the servant was returning to a place after a blast had been fired, the first employé to enter such place must make a careful examination for any loose rock or other element of danger, and if any such should be found he should immediately make the place safe.

Still another rule required the employés to carefully ex-

amine the workings before setting up machines, and all miss-
ed holes should be fired before drilling was commenced
again.

Taking these rules together, what do they mean? Each
man was to ascertain that the particular place in which he
was employed was absolutely safe.  What is meant by the
"particular place"?  Is the servant to understand by this rule
that he is to examine all the conditions of the mine that
might affect his safety; or was he to examine the condi-
tions immediately about him, whereby he might be injured
if the place was unsafe?  The particular place is no doubt the
place where the servant is at work, and the conditions to be
examined are those conditions immediately surrounding him.
Employés must carefully examine the workings before set-
ting up machines, and all missed holes must be fired before
drilling is commenced.  This means, so far as the rule may
be construed by persons of ordinary understanding, it seems
to me, when taken with the other rule as to the particular
place, that the servant should carefully examine the ground
before setting up his machine, has reference to the working
at the place where the machine is to be set or is being set,
and more · especially to examine for missed holes before
commencing work.  Again, when returning to any place after
a blast had been fired, the first employé to enter such place
must make a careful examination for any loose rock or other
element of danger.  In the case at bar it is said the plaintiff
was the first person to return to the workings in the Glory
Hole after the blast was fired, and that the duty devolved
upon him to make the examination for loose rock or other
elements of danger.  This rule seems to presuppose, at least,
that rock might become loosened above the place where the
servant was at work, and that any rock so loosened by the
blast should be removed before work was resumed.  The
rule refers to conditions that may grow out of the blasting,

rather than to conditions that might have existed before the blast was fired.

It would seem in this case that there were some dangers peculiar to the place in which the servant was working that he necessarily understood and should have taken note of; that one of these conditions was the liability of the rock upon the wall of the Glory Hole to slip from its place and fall down at various times; that to guard against such dangers required constant watchfulness on the part of the employé. And these rules seem to have been drawn, partially, at least, to call the attention of the employé to this danger, and to so emphasize it that watchfulness in this regard might be constant on the part of the servant. It is in evidence, and the testimony upon this proposition is uncontradicted, that after the benches in this mine are worked down to the bottom of what is called the Glory Hole or the 110 foot level, before working further it is the custom to begin at the top and work all the way down with pick, bar, and shovel, to remove and clean off any loose rock or dirt that may be found upon the side of the wall in a position where it might come down at any time during the progress of the work unless cleared away. When the walls have been thus prepared it seems the work of cutting down new benches and blasting off the ore began anew. By clearing this wall from all loose or shattered rock that might have been left, the master seems to have done all that was reasonably necessary to make further work in this place a reasonably safe employment. The pieces of rock that might be disturbed thereafter by blasting and other changing conditions of the mine were matters that the employé was charged to examine into and ascertain from time to time as blasting occurred in the mine. But this was a duty not only required of the employé, but a duty that devolved upon the master as well, in order that the place might be made a reasonably safe one

in which the servant might perform his work. Is the adoption of a rule requiring the servant to examine as to his own safety all that is required of the master in this behalf? Clearly not. Whatever the master may require of his servant in this respect, he cannot wholly relieve himself of obligation. But if the danger is a patent one—if it is a danger that is obvious—and might or should have been known by the master, should it not have been equally known by the servant, who was required to examine for himself the conditions that existed before exposing himself to possible danger? I have no doubt upon this question so far as it may be said to arise from the facts presented in this regard. The danger being obvious and patent to the master and servant alike, both are at fault if the servant continues to labor under such circumstances, and clearly the servant is guilty of contributory negligence. But the evidence in this case does not seem clearly to present the question to which I refer.

The plaintiff testifies that the slide of rock came from the surface some 80 feet above him; that he examined the side of the wall above him after the blast as far as he could see; that he was unable to see the surface, and could not see the particular point from which the rock came that struck him and injured him. Other witnesses say that the rock which did the injury came from a few feet above the plaintiff's head, and was clearly to be seen by a reasonable examination on the part of the plaintiff, and might have been barred down. The plaintiff's helper testifies substantially that he saw the place from which the rock fell a moment before it did fall; that he was nearer the wall and in front of the machine, and jumped away to a place of safety. Another witness testifies on behalf of the plaintiff that shortly after the accident he examined the wall and the surface, and found cracks running down through the frozen dirt on the surface, and that the surface and side of the wall had the ap-

pearance of a slide having occurred near that point. The evidence of the foreman whose duty it was to keep watch of the changing conditions of the mine is to the effect that he examined the ground all the way up to the surface about 10 o'clock of the day on which the accident occurred; that he saw no evidences of the wall giving way at any place, or any other evidences of danger. Other witnesses for the defendant say that an examination of the bank had been made shortly before the accident, and that everything seemed safe and all right as far as they could discover. It is further in evidence that the machine men were specially instructed to examine the ground above them after a blast to the top of the mine, and see if there was anything of a dangerous nature threatening them. It is further in evidence that one witness saw the rock fall; that a little dirt and debris first fell, and he thought the plaintiff turned and was shutting off the air from his drill, when he was struck by a rock of about 30 or 40 pounds weight between the shoulders, and knocked from the place where he was standing. The plaintiff himself seems to corroborate this statement, because he says the rock hit him from behind. The same witness, speaking of the falling of the rock, states that he saw distinctly the place from which it came, and it was only a few feet above the head of the plaintiff as he stood upon the tripod, and was within reach by using a bar; that he was about 75 feet distant from the plaintiff at the time of the accident. Under these somewhat contradictory statements, we are presented, first, with the question as to whether the place from which the rock fell is in any sense material to the issues in this case. If it came from the surface, or near the surface, some 80 feet above where the plaintiff was at work, as stated by himself, or even 30 feet, as stated by another, was the danger that threatened a patent one, one that was obvious, and might have been known by the

defendant corporation had it used reasonable care for the safety of the place in which its servant was working? The plaintiff testifies that he did not see the place from whence the rock came, but claims that it came from the surface. The foreman, whose duty it was to examine the conditions above, stated that he did so shortly before the accident, and he could observe nothing in the appearance of the walls of the mine that indicated a dangerous condition in any respect. I am not stating the language of witnesses, but the substance of the evidence. Other witnesses for the defendant state practically the same thing. If the falling of the rock came from near the surface, then, as claimed by the plaintiff, the fault or defect or cause of the slide was neither obvious nor patent, and it would seem that the defendant had used due care in making the place of the servant reasonably safe. In other words, the falling of the rock from which plaintiff received his injury, if coming from the surface in this way, was clearly one of those hidden dangers, known neither to master nor servant, and was inherent in the business or service in which the servant was engaged, and was a risk assumed by him as a part of his contract of hire. If, on the other hand, the fault in the wall and the place from which the rocks fell was within a few feet of the plaintiff, and only a few feet above his head, then the condition, if obvious, was one that the plaintiff himself, under the rules of the company and the duty of his position as explained to him by the officers of the company, should have discovered, and should have remedied by barring it down. If, then, the injury came from near the surface, it was the result of some hidden danger or defect, and the danger was such as inhered in the very nature of the employment; and there was therefore no negligence on the part of the defendant company if they used reasonable care in the examination of the conditions of the mine at its surface prior to the injury, and

the evidence upon this proposition seems to be undisputed. If the injury came from a fall of rock in the wall within a few feet of the plaintiff's head, then the defect and danger is one that he himself should have discovered under the rules of the company, and should have made his place of work safe by his own efforts, and his injury came, if injury he received in this way, because of his own disobedience to a plain rule of the company to make an examination of conditions around him after a blast had been fired and before he resumed his work.

It is to be remembered that the duty of the master to furnish a reasonably safe place for his servant to work is qualified by the conditions attending the work or service upon which the servant enters. The servant is presumed to understand those dangers necessarily inherent in the service upon which he enters, and he takes such risks upon himself. The duty of the master to furnish a safe place to work is qualified further by the duty of the servant to observe the rules of the company, and to so act in obedience thereto that the danger attending the work may be minimized as far as possible. The master never warrants the servant's safety and never guaranties the safety of the place; he discharges his duty by observing due care in this behalf. The servant may not by indifference and want of care bring misfortune upon himself, and then charge the master with negligence when disaster comes to him, but he must be alert and observant of conditions around him; and particularly is this true where the rules of the master, in addition to the duties the law imposes, require him to make inspection for his own protection. "Where the work in progress necessarily changes the character for safety of the place in which it is performed as the work progresses," says Judge Sanborn, "the hazard of the dangerous place and the increased hazard of the place made dangerous by the work are the ordinary

and well-known dangers of such place, and by the accept-
ance of the employment the servant necessarily assumes
them." Was the danger that confronted the plaintiff in the
case at bar made apparent and created by the changing con-
ditions of the work as it progressed? If so, it is said that
it is a danger inherent in the business in which the servant
was engaged, and a risk that he assumes in entering the
employment. Certainly it must be true as a proposition of
law that where the rules of the company require a servant
to make examination from time to time concerning these
changing conditions, and make the place a safe one by re-
moving the elements of danger, or by reporting the condi-
tions to his immediate boss, emphasizes to some extent the
rules of the common law, and imposes upon the servant a
positive duty as to these changing conditions for his own
protection. The master cannot be present at every moment
of time to constantly examine the changing conditions in a
mine, but he can formulate rules, and have them so under-
stood by the employé or servant that he will be advised, at
least, that he must make examinations for his own pro-
tection; and whether the danger is one that inheres in the
business, or one that may become patent by reason of the
changing conditions, the servant is bound by the rule to make
the examination, and a failure by him to thereby guard against
the threatening danger, if there be such danger, is his own
wrong and his own fault.

It is generally held that contributory negligence is a
question for the jury, and is one that should never be taken
from a jury unless the case is so clear that in case of a
verdict against the defendant it could not be sustained by the
court. Counsel for the plaintiff urges with a great deal of
earnestness and skill his claim that the evidence in the case
as to contributory negligence is at least contradictory, and
is therefore a question peculiarly for the jury. If counsel

were right in his assumptions of fact, I should readily agree
to that proposition; but is that true? The plaintiff testi-
fies, and his testimony is practically the only testimony on
the proposition furnished by the plaintiff, that the rock that
fell upon him came from the surface and was beyond his
view; that he could not, after the blast and before resuming
his work, from the point where he was working see the place
from which the rock came. Another witness (his brother-
in-law) testified that after the injury he went up onto the
surface, and found the ground cracked and opening at the
surface at a point immediately above the place where the
plaintiff was working. The condition of the ground after
the accident only tends to show the conditions as resulted
from the blast that had occurred immediately before the
plaintiff resumed his work of drilling. The same place had
been examined by the foreman before the blast, and no
dangers were apparent; there were no openings in the sur-
face or near the surface, and nothing to indicate danger
from that quarter. If danger was created by the blast, it
was one of the changing conditions of the work that the
defendant himself should have observed. If it was not a
condition created by the blast, the softening of the rains, and
the weather, then the action of the master in examining the
place from which it is claimed the injury came discharged
his duty of reasonable precaution, and the court would be
compelled to instruct the jury were the question submitted
to them. So that in either event it seems that there is
no question to present to the jury on the proposition if the
danger came from the surface, as contended. That was one
of the inherent risks of the employment. If the injury came
from a place immediately about the plaintiff as a result from
the blast, the question of contributory negligence is too
plain for discussion, even in view of the duties devolving
upon the servant in this changing condition of the mine, and

the rule which made it his special duty to examine as to those conditions. The only doubt raised in my mind in considering the proposition of safe place and the contributory negligence of the plaintiff in this case arises from the general conditions existing at this mine. The suggestion has come to my mind that it might be the duty of the master, under the conditions as they exist at this mine, to have the walls examined after each blast by some person more capable of determining the degree of danger than an employé operating a machine drill. But there is no evidence in this case upon which such a question can be raised, but I suggest it for the consideration of counsel and the parties. There is no doubt but that this question will some time be squarely presented to the court.

Under all the circumstances of the case, however, I am forced to the conclusion that the defendant is not liable. I shall therefor instruct the jury to find for the defendant.